### RICE v. WILSON et al.

#### (District Court, D. Delaware. June 7, 1915.)

#### No. 335.

1. EQUITY ☞141—PLEADING FRAUD—ALLEGATIONS OF FACTS.

   A bill in a suit founded on fraud must aver particularly the facts constituting the fraud.

   [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 323–330, 333; Dec. Dig. ☞141.]

2. EQUITY ☞318—EVIDENCE—FRAUD.

   Fraud justifying relief in equity must be strictly proved.

   [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 20, 728–730; Dec. Dig. ☞348.]

3. CANCELLATION OF INSTRUMENTS ☞25—GROUNDS—FRAUD.

   A court of equity will not rescind a contract for fraud, where the position of the parties has been so altered by the execution of the contract, in whole or in part, that they cannot be restored approximately to their original position and a rescission would work gross inequity, but the wronged party is usually confined to an action at law.

   [Ed. Note.—For other cases, see Cancellation of Instruments, Dec. Dig. ☞25.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. INJUNCTION ⬤➾147—TEMPORARY INJUNCTION—EVIDENCE—SUFFICIENCY.

In a suit to restrain a buyer of corporate stock from voting the same, or disposing of it, on the ground that the stock was obtained by fraud, and for a return of the stock, evidence *held* not to show such fraud in the procurement of the transfer as to justify a preliminary injunction.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 320–322; Dec. Dig. ⬤➾147.]

In Equity. Suit by John V. Rice, Jr., against Joseph R. Wilson and another. Motion for a preliminary injunction denied, and restraining order dissolved.

Andrew C. Gray, of Wilmington, Del., for complainant.

Walter L. Sheppard, of Philadelphia, Pa., for defendants.

BRADFORD, District Judge. The matter now before the court for decision is an application for a preliminary injunction in a suit in equity wherein John V. Rice, Jr., a citizen of New Jersey, is complainant, and Joseph R. Wilson, a citizen of Pennsylvania, and Rice Gasoline Rock Drill Company, a corporation and citizen of Delaware, hereinafter referred to as the drill company, are defendants. Rice seeks to restrain, until the further order of the court, Wilson from voting 2,400 shares of the common stock and 600 shares of the preferred stock of the drill company, alleged to have been fraudulently obtained from him by Wilson, at any of its meetings; from selling or disposing of the said shares of common and preferred stock or transferring or attempting to have transferred the same on the books of the company, or otherwise exercising any right therein as owner thereof, and the company from transferring or allowing to be transferred on its books the said shares of common and preferred stock now standing in Wilson's name, or from receiving, accounting, or in any way considering any votes cast at any meeting of the company by virtue of or representing the said shares of stock. The bill prays, among other things, that Wilson be declared to have received the said shares of common and preferred stock as the property of and for the benefit and use of Rice; that Wilson be decreed to assign, set over and return the same to Rice; that the title of Rice in and to the same be quieted and confirmed; that the same be entered on the company's books in Rice's name; and that the company issue to Rice out of the stockholdings of Wilson in the company certificates representing the said shares of common and preferred stock. Rice alleges in the bill that Wilson obtained from him the shares of stock in question by "fraud, artifice and misrepresentation," and avers in substance, among other things, that on or about December 15, 1912, Rice retained Wilson, who is a practicing attorney at law, as counsel to represent him in certain business disputes with one Harris Hammond; that on or about December 16, 1912, Wilson represented to Rice that it would be advisable and necessary to secure, as associate counsel with him, Morgan J. O'Brien, stating that O'Brien, owing to his eminence at the Bar, would be of great value in securing an advantageous settlement of the matters in dispute between Hammond and himself, and further

that by reason of O'Brien's eminence, skill, learning and ability, his services were in great demand, and of great value, and further that in order to secure O'Brien's services it would be necessary for Rice to agree to pay a fee of $25,000 for the services of Wilson and O'Brien relating to the said matters in dispute, the said fee to be equally divided between Wilson and O'Brien; that on or about December 16, 1912, Wilson requested Rice to go with him to O'Brien's offices for the purpose of inducing Rice to believe in and rely upon representations made by Wilson relative to the employment and remuneration of O'Brien; that Rice believing in and relying upon Wilson's representations, consented that Wilson should retain O'Brien in order to secure the benefit of his skill, learning, ability and professional standing, and agreed to pay Wilson as a fee for services to be rendered to Rice by Wilson and O'Brien, in connection with the said matters in dispute, the said sum of $25,000, one-half thereof to be paid by Wilson to O'Brien; that relying upon and believing in Wilson's representations, Rice accompanied him on or about December 16, 1912, to O'Brien's offices, and on arriving there Wilson requested Rice to remain in the general waiting room of said offices, while he, Wilson, went into an inner office; that Wilson returned in a few minutes with another gentleman to whom Rice was introduced but whose name Rice has forgotten, and who was not O'Brien, and no discussion regarding Rice's business was had between Rice and Wilson and the gentleman so introduced to Rice; that Wilson "at various times and repeatedly from December 16, 1912, down to February 10, 1913, falsely and fraudulently represented to your orator that he had retained the services of and secured the cooperation and assistance" of O'Brien in representing Rice in the adjustment of his differences with Hammond; that between December 16, 1912, and February 10, 1913, Wilson falsely represented to Rice that he was giving him legal advice "not alone upon his own judgment and experience but upon the judgment and experience of his reputed associate counsel" and that the advice which Rice received from Wilson was in fact the legal advice of O'Brien, in which Wilson concurred; that the differences between Rice and Hammond were adjusted and settled and the scheme of such adjustment and settlement was falsely represented to Rice by Wilson at various times during the course of the dealings between Rice and Wilson as the adjustment and settlement which was advised and recommended by O'Brien acting in conjunction with Wilson as counsel and attorney for Rice; that during the negotiations for the settlement of the differences between Rice and Hammond, Wilson requested and induced Rice to assume an indebtedness of $6,500 upon the agreement and promise of Hammond to pay $12,500 of the fee agreed to be paid by Rice to Wilson for his own and O'Brien's services; that it was in consequence of and in reliance upon the misrepresentations and artifices of Wilson and the belief arising therefrom on the part of Rice that O'Brien had been retained and was acting as attorney and counsel for him that Rice agreed to pay Wilson a fee of $25,000 to be equally divided between Wilson and O'Brien; that $12,500 of the fee of $25,000 which was assumed by Hammond has been settled by the latter by the payment by him to

Wilson of $2,500 in cash and the assignment of stock of the drill company of the par value of $50,000; that on or about February 10, 1913, in pursuance of his agreement to pay to Wilson the balance of his part of the fee of $25,000, Rice, fully relying upon the representations of Wilson that O'Brien had been associated as counsel for him, and that O'Brien had been acting as such counsel in the settlement of the business differences between him and Hammond, executed to the order of Wilson a promissory note for $12,000 payable on demand on account of the sum of $12,500 due by Rice to Wilson as his share of the fee of $25,000, the balance of $500 having been previously paid in cash by Rice to Wilson, and to secure the above mentioned note of $12,000 Rice assigned as collateral 12,476 shares of the common and 2,500 shares of the preferred stock of the drill company; that from the day on which Rice delivered to Wilson the above mentioned note for $12,000, the latter repeatedly demanded from Rice payment of the same, and on April 30, 1913, Rice still relying upon and believing the representations of Wilson that O'Brien had represented and acted for him, and that he, Rice, had had the benefit of the services of the former in the settlement of his business differences with Hammond, paid and settled the note for $12,000 by assigning and delivering to Wilson the shares of common and preferred stock in question, the said stock being transferred on the books of the company and standing in the name of Wilson; that Wilson did not retain O'Brien as associate attorney and counsel to represent Rice in his business differences with Hammond, and did not pay to O'Brien any money, stock or other valuable thing for services as counsel for Rice, and O'Brien did not perform or render any services or service as counsel for Rice, and Wilson's representations that O'Brien had been retained and had acted as counsel for Rice were false; that in the summer of 1914 Wilson denied to Rice that O'Brien had ever been retained by him, and that he had ever so stated; that but for the artifices and misrepresentations of Wilson, Rice would not have agreed to pay the former a fee of $25,000 nor would he have delivered to Wilson on account of the fee the shares of common and preferred stock in question. Other allegations in the bill are to the effect that the authorized capital stock of the drill company amounts to $2,500,000 divided into $500,000 of preferred and $2,000,-000 of common stock, each share being of the par value of $100 and entitled to one vote at the meetings of the company; that all of the said stock has been issued and is outstanding with the exception of 1,500 shares of preferred and 1,000 shares of common stock which are held in the treasury of the company; that Rice has legal title to three shares of the capital stock of the company, and is the equitable owner of 10,000 shares of its common and preferred stock now standing on its books in the name of William H. Bartlett, the same having been transferred by Rice to him in June, 1913, to be held by the latter in trust, Bartlett agreeing to vote the same together with his own stock at all meetings of the company "for their mutual and joint interest, in order to keep control of the voting power on said stock, and by such joint stockholdings control the selection of the directors and officers of the company"; that Rice is a director and the president of the

drill company, and Wilson intends and proposes to vote the said shares of common and preferred stock fraudulently secured from Rice, or to influence the vote of said stock for the election of directors, other than those who might be selected by or agreeable to Rice with intent "to endeavor to have elected as president of the said company some person other than your orator by which the direction of the business and financial affairs of the company will be entirely lost to your orator, and he will be deprived of the salary and emoluments which he would otherwise have as president," etc.

[1-4] The bill abounds in adjectives imputing fraud to Wilson; but mere adjectives of fraud cannot supply the place of the averment of facts constituting the fraud. Fraud must be not only particularly alleged but strictly proved. Even then it does not follow that it will in all cases justify rescission of the contract touching which fraud has been practiced. It is a general, though not a universal rule, that a court of equity will not rescind a contract even on the ground of fraud where the position of the parties has been so altered by reason of the execution of the contract, in whole or in part, that they cannot be restored fully or approximately to their original position and a rescission would work gross inequity. In such cases the wronged party may generally speaking have recourse to an action at law, based upon deceit or fraud in order to obtain redress. It is, however, unnecessary to pursue the inquiry when or under what circumstances rescission of a contract may be declared and enforced by a court of equity on the ground of fraud; for on the proofs before the court contained in the affidavits in connection with the sworn bill and answer, I am convinced that no fraud on the part of Wilson has been established. It is not denied that Rice retained Wilson as his counsel with respect to the matters in dispute between Hammond and himself, or that Rice agreed to pay Wilson $25,000 as a fee for professional services in that connection; or that the adjustment and settlement of such matters in dispute was not wholly successful; or that the sum of $25,000 was a proper charge for the services rendered. Indeed it was admitted by the solicitor for Rice in open court at the hearing that the adjustment and settlement effected by Wilson were just as satisfactory as if O'Brien had taken an active part in that behalf. But it is alleged and claimed in substance by Rice that Wilson at the time of the fixing of the fee agreed to secure the services of O'Brien, and pay him one-half of it and that Wilson fraudulently omitted to secure such services and fraudulently and repeatedly stated to Rice that he had secured them and that O'Brien was taking an active part in the adjustment of the matters in dispute between Rice and Hammond.

In opposition to the contention of Rice, Wilson claims that it was not at any time understood or agreed between him and Rice that O'Brien should be paid one-half of the $25,000 fee or any part of it, but that in case of litigation growing out of the matters in dispute between Rice and Hammond, Wilson would call upon O'Brien for assistance owing to his ability and professional standing, and that no such litigation having occurred O'Brien was not employed by Wilson except with respect to the giving of advice as to the form of the adjustment and settlement between Rice and Hammond, for which ad-

vice Wilson paid and satisfied O'Brien. Aside from the bill, three affidavits have been filed on behalf of Rice by C. Fisk Thompson, who was bookkeeper and general office manager of the Rice Gas Engine Company, of which Rice was vice-president and general manager, Mary Graham Rice, Rice's sister, and Helen A. Flynn, a director of the drill company and employed by Rice as stenographer. Thompson states in his affidavit:

"One evening about December 1912 Mr. Rice decided to retain Joseph R. Wilson, one of the respondents above mentioned, as counsel to look after his interests in the settlement with Mr. Harris Hammond. Mr. Wilson came to Mr. Rice's house in the evening. There were present Mr. Wilson, Mr. Rice and myself in the livingroom at the Bonaparte Park Mansion. Mr. Rice and I both stated to Mr. Wilson the differences existing between Mr. Rice and Mr. Hammond. Mr. Wilson thereupon stated that this was an important case in his estimation, and that there were two ways in which the matter should be handled, namely, either to file three bills in equity, or to handle it in a diplomatic way, and he said that he knew just the man in New York City to associate with him, and mentioned the name of Morgan J. O'Brien, Esq., a practicing lawyer of New York City, stating that he had been for many years the presiding judge of one of the courts in New York City. A few evenings subsequent to this I saw Mr. Wilson upon his return from New York City, and Mr. Wilson said to me, 'Mr. Thompson, I am so anxious to win this case that I have associated with me Mr. Morgan J. O'Brien, one of the biggest lawyers in New York City, a man who was for thirty years the presiding judge of a court in New York City (the name of which he mentioned but which I have forgotten) and I am going to pay him one-half of my fee.' "

Rice's sister in her affidavit states:

"During the latter part of January, A. D. 1912, I was visiting my brother at the Bonaparte Mansion at Bordentown, New Jersey, and there learned that certain business disputes between my brother, John V. Rice, Jr., and Harris Hammond were approaching a settlement. Joseph R. Wilson, one of the respondents in the above entitled cause, was present and acting as my brother's attorney and discussed with my brother, the said John V. Rice, in my presence, the terms of said settlement. I expressed amazement at the amount of the fee for legal services, it being stated as twenty-five thousand dollars, when the said Joseph R. Wilson stated to me that Morgan J. O'Brien had been associated as counsel with him, and had acted as my brother's counsel in the difficulties between him and the said Harris Hammond, and that because of Mr. O'Brien's great legal learning and standing as a member of the Bar he could not be obtained as counsel except upon the payment of a large amount of money, and that the proposed fee of twenty-five thousand dollars was to be shared between the said Morgan J. O'Brien and the said Joseph R. Wilson."

Helen A. Flynn in her affidavit states that the letter shown in Exhibit E attached to the answer of Wilson was typewritten by her at Wilson's dictation, and at his request signed by Rice. I attach little or no importance to the last mentioned affidavit. Wilson in paragraph 12 of his answer had erroneously stated that the letter disclosed in Exhibit E was in the handwriting of Rice, but subsequently in an amendment to his answer states that the error was occasioned by a mistake on the part of his counsel who drafted the answer, in confusing "the aforesaid letter of February 10, 1913, with the previous letter of January 7, 1913, a copy of which is appended to the answer marked Exhibit C," Wilson failing to notice the error prior to verifying the answer. Rice in the letter contained in Exhibit E, however, and addressed to Wilson, states:

"This is to certify that the settlement made to-day is in complete compliance with the agreement of settlement made by you with Mr. Hammond, January 6, 1913, and is satisfactory in every way to me."

It does not directly or indirectly refer to the contested point whether Wilson agreed with Rice to pay one-half of the stipulated fee to O'Brien. With respect to the affidavit of Mary Graham Rice, it is proper to say first, that she is the sister of Rice, secondly, that she states that the business disputes between Rice and Hammond were approaching a settlement in the latter part of January, 1912, some eleven months before Rice retained Wilson as his counsel, and thirdly, that she does not impute to Wilson any statement that O'Brien was to receive one-half of the agreed fee or any other proportion, but only that the fee was to be shared between O'Brien and Wilson. I am satisfied that the affiant omitted the essential qualification that Wilson would secure the services of O'Brien only with respect to any litigation that might arise in New York. The affidavit of Thompson lends some support to the contention of Rice, but is outweighed and refuted by Wilson's answer in connection with the affidavits of William McK. Morris and Morgan J. O'Brien in connection with documentary evidence in the case. Morris, who is the vice-president of the First National Bank of Bordentown, and secretary and treasurer of Morris and Company of Groveville, New Jersey, states in his affidavit:

"I was present on the night of December 18, 1912, when John V. Rice, Jr., retained Joseph R. Wilson as counsel in his case against Harris Hammond. It took place in the Bonaparte Mansion at Bordentown. Rice sent his car for me, and I arrived at the mansion a little after 8:00 p. m. Rice took me at once into the sitting-room where Mr. Wilson was sitting, and presented me to him. Mr. Wilson and Mr. Rice discussed the case in my presence for nearly four hours, and Mr. Wilson mapped out his plan of action. At the expiration of time, Rice asked me to go into another room, and he told me that he had agreed to pay Mr. Wilson twenty-five thousand dollars to represent him against Hammond. * * * I told Rice that I thought the fee was a big one. He praised Mr. Wilson higher than the skies, and said that he was the man to get him out of his difficulties, as he had done before when his previous cases looked almost hopeless, and that he was willing to pay him that fee. He said, 'Why, if he wins against Hammond, that fee won't be anything.' He said that Mr. Wilson had gone over the case with him thoroughly, and had spent an entire day and a night and until 2:00 o'clock the next morning going over it with him. * * * After this was completed Mr. Wilson said to Rice, 'Our agreement should be in writing,' and Rice said, 'Well, you write it out and I will copy it.' He got a pencil and paper and Mr. Wilson wrote out two forms of letters, in one of which Rice retained him as counsel, and in the other stated that he was to receive a fee of twenty-five thousand dollars. Rice took these two drafts, prepared by Mr. Wilson, and went into another room and came back with them both written in his own handwriting. I know this because Mr. Wilson handed them both to me to read. During the discussion between Mr. Wilson and Mr. Rice, before Rice took me out of the room, Mr. Wilson said that if any Court work was necessary in New York that he knew Judge Morgan J. O'Brien who stood very high, and he could go to him if necessary, but that he had every confidence that he could handle this alone, without the assistance of anybody. He said, 'I may decide to go over the case with Judge O'Brien before seeing Hammond.' This was the only reference made to Judge O'Brien. I have read a bill of complaint by Rice against Wilson in which he says that Morgan J. O'Brien was to have half the fee. Nothing was either said or suggested with respect to Judge O'Brien being associate counsel with Mr. Wilson, or that any part of Mr. Wilson's fee was to go to him."

O'Brien in his affidavit states:

"My first knowledge of the matters recited in the bill of complaint aforesaid was derived through an interview on or about December 20, 1912, in my office with Mr. Wilson. Mr. Wilson first interviewed me alone and explained to me that he had been retained by Mr. Rice to represent him in certain negotiations and litigation if necessary in connection with certain controversies between Rice and Harris Hammond of New York City. He showed me his contract with Rice in writing, whereby Rice undertook to pay him $25,000 for his professional services to be rendered in connection with these matters. He stated to me that in the event of litigation in New York City he might require my assistance in association with him, and would like to feel he could call upon me for such service should it be necessary. He stated to me that whatever service he might require of me in connection with these matters, he would compensate me for on a basis satisfactory to me. Mr. Wilson subsequently called to see me on a number of occasions and advised me of the progress he was making in his negotiations with Mr. Hammond. Mr. Wilson subsequently informed me that he had effected an agreement of adjustment between Messrs. Rice and Hammond that was satisfactory to all parties. I had no part, however, in the negotiations or consummation of this agreement. * * * My relations with the whole matter were personal and professional with Mr. Wilson as his associate, and in no sense did I enter into official relation with Mr. Rice as his counsel. I had no claim for services against Mr. Rice, and have never made any. I look to Mr. Wilson for my compensation and am satisfied with the adjustment which I have made with him respecting the same."

Wilson in his affidavit of March 13, 1915, subsequently denies that he ever had any conversation with Mary Graham Rice respecting the fee which Rice had previously agreed to pay him, or respecting his professional relations with O'Brien, or that he at any time discussed with C. Fisk Thompson either his fee or the association of O'Brien with him in representing Rice against Hammond or that he said to Thompson that he was going to pay O'Brien one-half of his fee or any part thereof.

While, as above appears, there is conflict in this case between the affidavits filed in behalf of the respective parties, and also between the bill and answer, a decided and controlling preponderance of the evidence, including that which is documentary, is against the contention of Rice that Wilson deceived or practiced any fraud upon him touching the employment of O'Brien in connection with the adjustment of the matters in dispute between Rice and Hammond. Exhibit A attached to the answer sets forth a letter of Rice addressed to Wilson dated December 18, 1912, in which Rice says:

"I hereby employ and retain you as chief counsel in all my affairs relating to my business transactions and disputes with Harris Hammond, with full power to compromise, settle and adjust the same as fully as I could do myself, hereby ratifying and confirming anything that you may do in the premises, and binding myself to abide thereby."

In a supplementary letter of Rice addressed to Wilson on the same day (Exhibit B) he said:

"In consideration of your acceptance of my appointment of you as chief counsel, to represent me in all my affairs relating to my business transactions and disputes with Mr. Harris Hammond of New York and Bordentown, son of John Hayes Hammond, I hereby agree to pay you a fee of twenty-five thousand ($25,000.00) dollars, on the settlement of such business transactions and disputes, whether the settlement be effected by suit and judgment or decree of

the court or by compromise, and irrespective of the time consumed, be it short or long."

In a letter signed by Rice and addressed to Wilson January 7, 1913, shown in Exhibit C attached to the answer Rice says:

"It seems impossible for me to express in words my appreciation of your marvelous ability in so quickly and successfully settling all the disputes and difficulties between Mr. Harris Hammond and myself, in connection with the Bonaparte Park property at Bordentown, the Rice Gas Engine Company and the Rice Gasoline Rock Drill patents, involving nearly $4,000,000. You have brilliantly earned your fee of twenty-five thousand dollars, and this is not the limit of my appreciation. Among other things, I offer you a directorship in the Rice Gasoline Rock Drill Company and also invite you to be its chief counsel, and again expressing my eternal gratitude for your great achievement in my behalf, I am always your friend and debtor."

It appears that this letter was the result of a request on the part of Wilson that Rice should give him a letter of appreciation of what he had done for him; that Rice began to write such a letter and that Wilson interrupted him and said it would not do; that Rice asked Wilson what he wanted him to say and Wilson told him he must write a strong letter; that Rice then asked Wilson if he would write it, stating that he, Rice, would copy it; that thereupon Wilson wrote the letter and Rice copied it as written by the former for Rice's signature. In reference to this letter Rice in the same affidavit says:

"I had been under a considerable strain owing to business worries at the time, and on the night in question was extremely nervous and upset, owing to such business strain, and also to excessive drinking, in which I had been indulging for some time on account of the strain I was under. I was so relieved when Mr. Wilson told me that all my business disputes with the said Hammond had been settled advantageously to me, that I was glad to sign, in my then condition, any letter that Mr. Wilson presented to me."

Whatever may be said or thought of the taste displayed by Wilson in thus securing from Rice the above letter, the fact remains that there is no denial by Rice of the truthfulness of its statements; nor is there any claim made by Rice that he did not know or fully appreciate the contents of the letter he thus signed. Further whatever may have been the nervous condition of Rice on that occasion it is to be observed that in his affidavit made over two years afterwards he expressly recognizes that "all my business disputes with the said Hammond had been settled advantageously to me." In that letter there is not a hint or suggestion as to the association of O'Brien with Wilson in the settlement of the matters in dispute or of any right on the part of O'Brien to receive any portion of the $25,000 fee. On the contrary the tenor and spirit of the letter are inconsistent with such an idea, Rice saying, "You have brilliantly earned your fee of twenty-five thousand dollars." But in whatever light the letter of January 7, 1913, might be viewed, aside from other documentary evidence, it must be taken in connection with the letters contained in Exhibits A and B and in affidavits on behalf of Wilson. No documentary evidence is disclosed in the case, other than that contained in Exhibits A, B, and C, touching the employment by Rice of counsel to adjust his matters in dispute with Hammond. If it be true that Rice had been led to believe that the employment by Wilson of O'Brien was a matter of

such moment as Rice now contends it was, and if there was an oral understanding that one-half of the total fee of $25,000 was to go to O'Brien, and Wilson was to have only the remaining half, it is remarkable and unaccountable that there should be a total omission of any stipulation to that effect in either of the two above mentioned letters, Exhibits A and B. Rice was of full age and a man of intelligence on his own showing and there is no evidence that he was at the time these letters were written either intoxicated or insane. He does not anywhere state that he did not know what he was doing when he signed them, nor has he produced any evidence on the part of any friend, relative or other person to show that he was not capable of fully understanding and appreciating the purport of the letters written by him. Further, if it be true that Rice was led by Wilson to believe that O'Brien had taken an active, efficient and principal part in the eminently successful and satisfactory adjustment of the matters in dispute between Hammond and himself, it is also remarkable and unaccountable that he should wholly have omitted to testify to Hammond his high appreciation of his valuable services. Rice states in the bill that during the period between December 16, 1912, and February 10, 1913, Wilson represented to him that he was advising him not alone upon his own judgment and experience, but upon the judgment and experience of O'Brien, and that the advice which Rice received was in point of fact the advice of O'Brien in which Wilson concurred, and further that Wilson represented to Rice during that period covering the date of Rice's letter of appreciation to Wilson that the adjustment and settlement agreed upon with Hammond was advised and recommended by O'Brien in conjunction with Wilson; and further, that it was not until long after, namely, in the midsummer of 1914 that Rice received any definite information that O'Brien had not been retained by Wilson. Under these circumstances if the statement by Rice is correct, it is difficult, if not impossible, to conceive of any reason why he should have wholly omitted while writing eulogistically to Wilson to say a word of commendation or recognition of what according to his own statement he was led to believe had been vitally important professional service on the part of O'Brien of which he had had the benefit. That it does not appear that Rice in any manner or to the slightest extent recognized directly or indirectly that the result with which he was so well pleased was the work in whole or in part of O'Brien, while in full accord with the contention of Wilson, serves to render the correctness of the statements of Rice as to his alleged understanding of the professional relationship of O'Brien to himself too improbable for acceptance. The principal object of this suit is evidently the control by Rice of the management and direction of the affairs of the drill company. Aside from such an intention no sufficient reason appears for this litigation. It seems the height of unreason that Rice after obtaining all he had considered himself entitled to should complain because the lawyer who rendered the service, clearly shown by the admission of Rice to have been worth the $25,000 fee, actively conducted the negotiations himself instead of employing some other attorney to help him; and this court cannot assume and does not believe

that, even if a false representation had been made by Wilson as to the employment of O'Brien, Rice would have brought this suit for the recovery of the shares of stock in question, aside from the securing of control over the management and direction of the affairs of the company. The evidence taken as a whole has satisfied me beyond reasonable doubt that the contention made by Rice in this case cannot be sustained.

The motion for a preliminary injunction must be denied, and the restraining order dissolved, with costs.